STATE OF NORTH CAROLINA
v.
JAMES HENRY CONLEY
No. COA09-456.
Court of Appeals of North Carolina.
Filed January 19, 2010.
This case not for publication
Attorney General Roy Cooper, by Assistant Attorney General Steven F. Bryant, for the State.
Paul F. Herzog for defendant-appellant.
ROBERT N. HUNTER, Jr., Judge.
A jury convicted James Henry Conley ("defendant") of first-degree murder on 29 August 2008 for killing Clem Jones ("C.Z."). Defendant appeals arguing that his murder indictment was constitutionally defective and that expert testimony concerning broken glass from his car was admitted at trial in violation of Crawford v. Washington, 541 U.S. 36, 158 L. Ed. 2d 177 (2004). We find no prejudicial error.

Facts
At trial, the State's evidence tended to show the following facts. On 31 March 2006, defendant, C.Z., and another passenger spent most of the day riding in defendant's 1992 Dodge Colt while drinking beer, taking cocaine, and smoking marijuana. When defendant dropped C.Z. off, C.Z. attempted to take the remaining half a case of beer with him. The other passenger and defendant objected, and told C.Z. to leave the beer with them since he did not pay for the beer or drugs. C.Z. reacted to defendant's request by throwing beer bottles at defendant's car, kicking out the passenger side window, and creating numerous dents all over the car's body.
Defendant responded to C.Z.'s overreaction concerning the beer by calling his cousin, Thomas Smith, and asking to borrow his .22 caliber rifle. When defendant explained to Thomas that he was upset about C.Z. damaging his car, Thomas said, "Hell, no, you can't have my gun."
Defendant then drove to the home of another cousin, Kenny Jones. In January 2006, Kenny received a 12-gauge sawed-off shotgun for a birthday present from his aunt. Defendant went into Kenny's house and pulled the shotgun out from under Kenny's bed. As defendant marched back to his car with the gun, Kenny heard defendant mumbling that he was going to "kill the son of a bitch." Kenny tried to keep defendant from leaving to no avail.
During defendant's search for a firearm, C.Z. walked in and around the city limits of Pembroke, North Carolina. He eventually approached Wayne Locklear in the parking lot of Michael's Restaurant to ask for a ride home. While C.Z. was talking with Mr. Locklear, a blue car pulled into the parking lot, and a man inside shot C.Z. in the head as he passed. Joshua Scott Locklear, 12 or 13 years old at the time, witnessed the drive-by shooting from inside his father's truck while waiting for his dad to return with some hoagies. At trial, Joshua testified that defendant drove through Michael's parking lot in his Dodge Colt, and fired one shot at C.Z. from inside the vehicle. C.Z. died as a result of the gunshot wound.
Police and SBI agents arrived at Michael's Restaurant after the shooting, and in the days following, defendant became a person of interest in the investigation. On 2 April 2006, defendant was brought to the police station by his mother for a consensual interview with Special Agent Brian Sullivan. Defendant stated that on the night of C.Z.'s murder, he drove to Thomas's house in Less's Mobile Home Park, and remained there until the next morning. When Agent Sullivan asked defendant about his car, defendant stated that the car was currently located at his grandfather's house at 300 Ottmus Road, Pembroke, North Carolina. Defendant told Agent Sullivan that he had moved the car there on 1 April 2006, the day after C.Z.'s death.
After the consensual interview, defendant gave Agent Sullivan permission to search his car at his grandfather's house on Ottmus Road. Detective Sebastian Veneziano impounded defendant's vehicle from the Ottmus Road location on 2 April 2006, and a glass sample was taken from the passenger side window of the car. On 3 April 2006, Detective Veneziano obtained two glass samples from Thomas's house located in Less's Mobile Home Park: one near the trailer and one from the roadway. Defendant was arrested in late April 2006.
On 19 June 2006, a grand jury returned a short-form true bill of indictment charging defendant with the first-degree murder of C.Z. Defendant pled not guilty, and trial commenced on 25 August 2008.
At trial, Special Agent Kristen Crawford testified for the State as an expert in forensic glass analysis. Agent Crawford's testimony consisted exclusively of summarizing a glass analysis report prepared by another SBI agent, Agent Beth Flanagan. Agent Crawford did not analyze the glass samples herself. In her report, Agent Flanagan compared three different samples of glass collected by Detective Veneziano during his investigation of the murder: (1) glass taken from the broken passenger window of defendant's Dodge Colt after it was impounded following his consensual interview; (2) glass taken from near Thomas's trailer at Less's Mobile Home Park on 3 April 2006, the day after defendant's consensual interview; and (3) glass found in the roadway in front of Thomas's trailer on 3 April 2006. Agent Flanagan opined in her report that the two samples from Thomas's lot at Less's Mobile Home Park were consistent with glass obtained from defendant's car after it was impounded. Agent Crawford relayed Agent Flanagan's findings to the jury during her testimony.
The jury convicted defendant of first-degree murder on 29 August 2008, and defendant gave oral notice of appeal after being sentenced.

Analysis

I.
Defendant claims that the short-form indictment used at trial is constitutionally defective, and that the trial court lacked jurisdiction to render a judgment. We conclude that this argument is not preserved for review.
Constitutional issues not raised at trial are deemed waived on appeal. State v. Upchurch, 332 N.C. 439, 456, 421 S.E.2d 577, 587 (1992). Defendant admits that no constitutional objection to the short-form indictment was raised at trial; therefore, this argument is waived for review in this Court.
The failure to properly preserve this objection for appeal is not subject to an analysis under Rule 2 of the North Carolina Rules of Appellate Procedure, because this State's Supreme Court has upheld the short-form indictment for first-degree murder, and stated that this short-form "serves to give a defendant sufficient notice of the nature and cause of the charges against him" under the North Carolina and United States Constitutions. State v. Squires, 357 N.C. 529, 537, 591 S.E.2d 837, 842 (2003), cert. denied, 541 U.S. 1088, 159 L. Ed. 2d 252 (2004). As a result, defendant cannot show that review in this Court is necessary "[t]o prevent manifest injustice." N.C.R. App. P. 2 (2009). This assignment of error is dismissed.

II.
Defendant argues that the trial court erred in admitting the testimony of SBI Agent Kristen Crawford, because Agent Crawford testified at trial "solely" by summarizing a glass analysis report prepared by another SBI agent, and did not offer an independent expert opinion. We agree that the trial court erred in admitting Agent Crawford's testimony, but conclude that the error is harmless and does not prejudice defendant.

A. Standard of Review.
No objection was raised to Agent Crawford's testimony at trial. However, because defendant asserts that it was plain error to admit this evidence, we review defendant's assignment of error under a plain error standard of review. N.C.R. App. P. 10(c)(4) (2009); State v. Gregory, 342 N.C. 580, 584, 467 S.E.2d 28, 31 (1996) (plain error analysis available as to whether evidence was improperly admitted). Plain error review of alleged constitutional violations does not require the State to carry its normal burden of showing that the error was "harmless beyond a reasonable doubt." N.C. Gen. Stat. § 15A-1443(b) (2007); State v. Lemons, 352 N.C. 87, 92, 530 S.E.2d 542, 545 (2000), cert. denied, 531 U.S. 1091, 148 L. Ed. 2d 698 (2001).
Under plain error review, a defendant must show either "(i) that a different result probably would have been reached but for the error or (ii) that the error was so fundamental as to result in a miscarriage of justice or denial of a fair trial." State v. Bishop, 346 N.C. 365, 385, 488 S.E.2d 769, 779 (1997). Plain error is the manifestation of a "fundamental error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done[.]" State v. Odom, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (quotations and citations omitted). Thus, under a plain error analysis, a defendant must show that the error was prejudicial. See State v. Verrier, 173 N.C. App. 123, 128, 617 S.E.2d 675, 679 (2005).

B. Testimonial Evidence and Melendez-Diaz.
In Crawford v. Washington, 541 U.S. 36, 158 L. Ed. 2d 177 (2004), the United States Supreme Court held that "[t]he Confrontation Clause of the Sixth Amendment bars admission of testimonial evidence unless the declarant is unavailable to testify and the accused has had a prior opportunity to cross-examine the declarant." State v. Locklear, 363 N.C. 438, 452, 681 S.E.2d 293, 304 (2009). The Supreme Court recently applied Crawford's holding in Melendez-Diaz v. Massachusetts, 557 U.S. ___, 174 L. Ed. 2d 314 (2009) to determine whether several "certificates of analysis" offered by the prosecution were inadmissible under Crawford to show that substances confiscated during an arrest were cocaine. Melendez-Diaz, 557 U.S. at ___, 174 L. Ed. 2d at 319-20. In applying what it called a "rather straightforward" application of Crawford, the Supreme Court noted that the "certificates of analysis" were sworn affidavits prepared by forensic analysts after the crime for the purpose of showing that the substances obtained were, in fact, cocaine. Id. at ___, 174 L. Ed. 2d at 321-22. The Court reasoned that "[t]he `certificates' [were] functionally identical to live, in-court testimony, doing `precisely what a witness does on direct examination.'" Id. at ___, 174 L. Ed. 2d at 321 (quoting Davis v. Washington, 547 U.S. 813, 830, 165 L. Ed. 2d 224, 242 (2006)). Thus, under Crawford, the Supreme Court held that the "certificates of analysis" were inadmissible testimonial hearsay absent the defendant being given a prior opportunity to cross-examine the unavailable declarant, i.e., the analysts preparing the "certificates of analysis." Id. at ___, 174 L. Ed. 2d at 321-22.
In State v. Locklear, the North Carolina Supreme Court expanded the holding of Melendez-Diaz to include in-court, expert testimony founded on reports prepared by non-testifying experts. Locklear, 363 N.C. at 451-53, 681 S.E.2d at 304-05. In Locklear, the State tendered an expert forensic pathologist, Dr. John D. Butts, who testified as to the identification and cause of death of a victim. Id. at 451, 681 S.E.2d at 304. Dr. Butts' testimony was based on two forensic analyses prepared for trial: (1) a forensic dental analysis identifying the victim, prepared by a non-testifying dentist; and (2) an autopsy report establishing the victim's cause of death, prepared by a non-testifying forensic pathologist. Id. Applying Crawford and Melendez-Diaz, the Locklear Court held that the trial court erred by admitting into evidence the autopsy report and the testimony of Dr. Butts over defendant's objection under the Sixth Amendment. Id. at 451-52, 681 S.E.2d at 304-05. However, even though the Locklear Court held that this evidence was improperly admitted, it concluded that the State met its burden of showing that the admission was "harmless beyond a reasonable doubt" given other "copious evidence" offered by the State. Id. at 453, 681 S.E.2d at 305.
This Court has applied Locklear's extension of Melendez-Diaz in State v. Galindo, ___ N.C. App. ___, 683 S.E.2d 785 (2009), and State v. Mobley, ___ N.C. App. ___, 684 S.E.2d 508 (2009). In Galindo, we held that the trial court erred by admitting testimony from a crime lab supervisorwho testified "solely" from a lab report prepared by another analystthat substances seized from the crime scene were cocaine. Galindo, ___ N.C. App. at ___, 683 S.E.2d at 787-89. The defendant in Galindo objected to the supervisor's testimony at trial. Id. at ___, 683 S.E.2d at 787. However, we concluded that the State satisfied its burden in demonstrating that the error was harmless beyond a reasonable doubt, because the "[d]efendant's own statement, in conjunction with the unchallenged testimony of law enforcement officers that they seized over one kilogram of cocaine establishe[d] beyond a reasonable doubt that, absent the admission of [the supervisor's] testimony, a reasonable jury would have found defendant guilty of trafficking in cocaine." Id. at ___, 683 S.E.2d at 788-89.
In Mobley, this Court distinguished the holding of Melendez-Diaz, and held that the admission of an independent expert opinion based on a non-testifying expert's report was not error. Mobley, ___ N.C. App. at ___, 684 S.E.2d at 511-12. Mobley addressed the testimony of Aby Moeykens, a DNA analyst who testified regarding several DNA tests conducted by other analysts at the Charlotte-Mecklenburg Police Crime Lab. Id. at ___, 684 S.E.2d at 509, 511. The defendant in Mobley objected to Ms. Moeykens' testimony only on hearsay grounds at trial. Id. at ___, 684 S.E.2d at 510. As a result, to reach the issue of testimonial hearsay, we stated that our review was necessary under Rule 2 of the North Carolina Rules of Appellate Procedure "to prevent manifest injustice" to the defendant. Id.
This Court held that no error occurred in admitting Ms. Moeykens' testimony, because she "testified not just to the results of other experts' tests, but to her own technical review of these tests, her own expert opinion of the accuracy of the non-testifying experts' tests, and her own expert opinion based on a comparison of the original data." Mobley, ___ N.C. App. at ___, 684 S.E.2d at 511. We further concluded that the admission of Ms. Moeykens' independent opinion was distinguishable from the Supreme Court's holding in Melendez-Diaz, because in that case "the certificates at issue were being introduced not as the basis for any expert's opinion but as prima facie evidence that the substance was cocaine." Id. at ___, 684 S.E.2d at 512. As a result, even though the reports relied upon by Ms. Moeykens were themselves inadmissible under Melendez-Diaz, this Court held that an expert's independent opinion based on such testimonial hearsay did not violate the Confrontation Clause of the Sixth Amendment. Id.
Other jurisdictions addressing the implications of Melendez-Diaz have recognized a similar distinction as that existing in Mobley. See, e.g., U.S. v. Johnson, Nos. 06-4391, 06-4392, 06-4527, 2009 WL 4348845 (4th Cir., Dec. 2, 2009) (decided under Maryland law) (independent expert opinion held admissible where offered to decode conversations in narcotics prosecution); Larkin v. Yates, No. CV 09-2034-DSF (CT), 2009 WL 2049991 (C.D. Cal., July 9, 2009) (expert opinion of DNA analyst held admissible under Melendez-Diaz); People v. Johnson, 915 N.E.2d 845 (Ill. App. 1 Dist., Sept. 18, 2009) (same). The core of these cases and our holding in Mobley restate the overarching Sixth Amendment principle reiterated in Melendez-Diaz: the Confrontation Clause applies to all testimonial, hearsay evidence offered at trial. Davis, 547 U.S. at 821, 165 L. Ed. 2d at 237 ("It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause."). Thus, if an expert is merely offering the opinion of another non-testifying expert via a testimonial document, the Confrontation Clause is invoked, and the Crawford safeguard of peremptory cross-examination applies. If an expert is presenting an independent analysis, subject to the rigors of cross-examination on the expert's own thoughts and conclusions, then the Confrontation Clause is satisfied, and no constitutional error may be established on appeal. See generally Mobley, ___ N.C. App. ___, 684 S.E.2d 508.
Applying this framework to the case sub judice, we must employ a four-part inquiry under Melendez-Diaz and Mobley: (1) whether the document at issue is testimonial; (2) if the document is testimonial, whether the declarant was unavailable at trial and defendant was given a prior opportunity to cross-examine the declarant; (3) if the defendant was not afforded the opportunity to cross-examine the unavailable declarant, whether the testifying expert was offering an independent opinion or merely summarizing another non-testifying expert's report or analysis; and (4) if the testifying expert summarized another non-testifying expert's report or analysis, whether the admission of the document through another testifying expert is reversible error.
The Melendez-Diaz Court reaffirmed the broad category outlined in Crawford that testimonial hearsay statements include those "`statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" Melendez-Diaz, 557 U.S. at ___, 174 L. Ed. 2d at 321 (quoting Crawford, 541 U.S. at 52, 158 L. Ed. 2d at 193). Here, the glass analysis report is testimonial, because Agent Flanagan prepared the report at the request of the State in the course of a murder investigation, and she should have reasonably believed that her report would be available for trial. Given the testimonial nature of the report, it was inadmissible at trial unless the State either (1) showed Agent Flanagan was available or (2) showed that she was unavailable and that defendant had a prior opportunity to cross-examine her. Melendez-Diaz, 557 U.S. at ___, 174 L. Ed. 2d at 322 ("Absent a showing that the analysts were unavailable to testify at trial and that petitioner had a prior opportunity to cross-examine them, petitioner was entitled to be confronted with the analysts at trial.") (quotations and citation omitted); Crawford, 541 U.S. at 59-60 n.9, 158 L. Ed. 2d at 197-98 n.9 ("The [Confrontation] Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it."). The State did not show that Agent Flanagan was available or that Agent Flanagan was unavailable and that defendant was able to cross-examine her. Thus, we conclude that the glass analysis report was inadmissible testimonial hearsay, and we next examine whether Agent Crawford's testimony concerning Agent Flanagan's report was an independent expert opinion or merely a summation of another expert's inadmissible report under Mobley.
At trial, Agent Crawford testified in relevant part:
Q. Now, have you had occasion to review a particular case XXXX-XXXXX? That would be the lab number.
A. Yes, I have.
Q. Is that a glass [analysis] of Beth Flanagan's?
A. Yes, it is.
Q. Okay. Have you also reviewed the lab notes pertaining to that analysis?
A. Yes, I have.
Q. What were the items that were analyzed in that particular matter?
A. I have . . . your item number 16,. . . your item number 18, and . . . your item number 19 which is the glass fragments from the mobile home park [Thomas Smith's house], the roadway in front of Lot 8 [in front of Thomas Smith's house], and the passenger window of the suspect's vehicle [obtained after defendant's car was impounded].
Q. All right. What was the nature of the analysis?
A. They [the State] requested glass analysis.
Q. Okay. Was a comparison done and could you tell us the manner in which the comparison was done.
A. Yes. Beth opened the items of evidence, noted what was inside, noted the type of glass, the thickness and the color, and then she performed two instrumental analyses for each item number and wrote her results.
Q. Now, is there a particular protocol to be followed in such an analysis?
A. Yeah, generally we do it the same way. I was trained by her; so, I do mine the same way.
Q. And just briefly summarize the method and what the determination was, if any.
A. Okay. First we open them up and look at them as far as just visually examining them. Color, and she has for all of them slightly greenish. So, all three items have slightly green glass in them. She also did the thickness and the type of glass. And for all of them, they were flat glass[.] . . . [Explanation of how flat glass is created and its qualities omitted.]
She [also] did a refractive index using our glass refractive index measurement system, and she did elemental composition using X-ray fluorescent spectrometry.
Q. And what could be determined as a result of those tests? Do you have that?
A. Her results are: . . . [t]he broken fragments from [the] lab items . . . could have shared a common origin.
. . . .
Q. And what kind of glass was involved here?
A. The tempered green glass that is consistent of, you know, side windows and rear windows [of cars].
(Emphasis added.)
The substance of Agent Crawford's testimony supports two conclusions: (1) that the glass samples are consistent with each other, and (2) that the samples are consistent with the type of green glass found in cars. The above testimony demonstrates that these conclusions were not formed through any sort of independent review and analysis on the part of Agent Crawford as required under our holding in Mobley; rather, the record shows that Agent Crawford merely summarized Agent Flanagan's findings. Thus, we conclude that the trial court erred in admitting Agent Crawford's testimony under Mobley and Melendez-Diaz.
We now turn to the question of whether this error constitutes reversible error under a plain error standard of review, and examine the record to determine whether "a different result probably would have been reached but for the error" or whether "the error was so fundamental as to result in a miscarriage of justice or denial of a fair trial." Bishop, 346 N.C. at 385, 488 S.E.2d at 779.
Defendant argues that the admission of Agent Crawford's summary of the glass analysis report was plain error, because the prosecutor used the testimony: "(1) [to] attack the credibility of [defendant's] statement to the SBI; (2) [to] bolster the credibility of [the] State's witness, Thomas Smith; (3) [to] place [defendant] near the scene; and, (4) to attribute motive and intent to [defendant.]" The record does not support defendant's assertions.
In referring to Agent Crawford's testimony in his closing argument, the district attorney stated in part:
Well, and who else was in that blue beat-up Dodge Colt with the window missing that was later found with gunshot residue in it. You know the defendant had it the whole evening. You know the defendant took it over to his grandfather's later. When it was found, it still had some gunshot residue on the passenger's seat. It still had the window, passenger window, broken out. The remainders of the glass were the same and consistent with the glass found where he had parked at Thomas' house after the shooting. All that. And we know the defendant told several people that, yes, it had been him. He told them what he was going to do; he told them what he had done. And they even know what he had done it with because he had the gun. So, he is placed at the scene at the right time with the weapon, with the intent, with the motive. The damage is done. He is identified by Joshua Scott Locklear as doing it. He then tells his family what he has done. Further, he takes the gun and just makes it disappear.
(Emphasis added.)
Looking at the district attorney's application of Agent Crawford's testimony to the State's case, it is apparent that the prosecution was presenting the glass analysis only to show that the glass samples at Thomas's mobile home in Less's Trailer Park were consistent with defendant's vehicle. Defendant's contention that the report was used as to credibility, proximity to the crime scene, motive, and intent are not supported by an examination of the record.
Moreover, in defendant's statements to the SBI following the murder, he admitted to being present at Thomas's house on the night of the shooting and the morning after. At trial, Special Agent Brian Sullivan recounted in part:
A. During the course of the interview, [defendant] stated that he had beenon the evening of the shooting of [C.Z.], he had been working for an individual named Waco Locklear during that day. . . . [S]ometime thereafter, he had returned to the residence of Thomas Earl Smith and he had remained there throughout that night into the next morning.
Given this admission to the SBI, defendant cannot show that Agent Crawford's testimony was plain error, because he admitted to being at the place where the shattered glass evidence placed him.

C. Conclusion.
The record is replete with other "copious evidence" of defendant's guilt not challenged in this appeal. Locklear, 363 N.C. at 453, 681 S.E.2d at 305. Since defendant has only challenged Agent Crawford's testimony, and has not shown that the admission of this evidence prejudiced his conviction, we find no reversible error under the standard of review in this case. This assignment of error is overruled.
No error.
Judges STEPHENS and BEASLEY concur.
Report per Rule 30(e).